No. 77,184

Louis Jackson, Jr., *Appellee*, v. City of Kansas City, Kansas, *Appellant*.

(947 P.2d 31)

Opinion filed October 31, 1997.

*Wesley K. Griffin*, assistant city attorney, argued the cause and was on the brief for appellant.

*Gerald N. Jeserich*, of Boal and Jeserich, of Kansas City, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: The City of Kansas City, Kansas, appeals from a jury verdict awarding $158,500 to Louis Jackson, Jr., for injuries sustained when his throat was cut from ear to ear while being held in police custody with his hands handcuffed behind his back and seated on a street curb. The City of Kansas City appeals, raising six issues.

We are required to view the disputed facts in the light most favorable to the party who prevailed in the trial court. When so viewed, the facts are as follows:

At approximately midnight, Leigh Ann Davis and her boyfriend, plaintiff Louis Jackson, Jr., got into a fight. A neighbor called 911 and indicated that Davis was injured and needed police assistance. Two Kansas City, Kansas law enforcement officers, Kim Crockett and Kent Anderson, were dispatched. The area was very dark. Flashlights were necessary to see. The officers found Davis on a porch bleeding and crying.

The officers observed Jackson walking away from the porch. They arrested him. His hands were handcuffed behind his back, and he was seated on the street curb with his feet out in the street. Jackson had on a white tee shirt with blood on it. Jackson had no visible wounds. The police car had cloth seats which could absorb blood, so a paddy wagon was called to transport Jackson to the police station. At this time, neither Jackson nor anyone else conveyed to the police that Davis had a box knife in her jeans pocket.

As previously stated, Jackson was sitting on the curb facing the street. Behind Jackson was a sidewalk and then a fence. On the other side of the fence was a front yard, and then a house with a front porch. When we view the evidence in the light most favorable to Jackson, it shows Davis was seated on the sidewalk somewhere behind Jackson.

Officer Crockett was standing in the street in front of Jackson. The evidence most favorable to Jackson indicates that Crockett was less than 2 feet in front of Jackson. Officer Anderson was to the right of Jackson. Both officers were using flashlights to enter information in their notebooks.

At some point, Davis left her position behind Jackson and walked toward Jackson, but she was interrupted by Crockett. Crockett testified he escorted Davis back to the porch. Jackson testified that Crockett never escorted Davis back to the porch. Davis herself claimed to have been seated on the sidewalk, not on the porch. The testimony is consistent that at no time was an officer placed between Davis and Jackson. However, Crockett testified that he felt the need to keep Davis and Jackson separated because they "could possibly hurt one another."

Crockett returned to standing in the street in front of Jackson, and Anderson stood in the street to the right of Jackson. Crockett was writing in his notebook when he heard Jackson say he had been set up. A reasonable interpretation of Jackson's comment would be that the police had put him in a position where he was helpless to protect himself from retaliation by Davis.

When Crockett looked up, Davis was standing directly behind Jackson, who was still seated on the curb. Davis pulled Jackson's head backward with one hand, reached around Jackson with her

other hand, and used the box knife to cut Jackson's throat from ear to ear.

Jackson testified that Crockett was close enough to reach out and stop Davis from cutting his (Jackson's) throat. The officers had to use force to disarm Davis.

The jury found Jackson 0% liable and the City of Kansas City, Kansas, 100% liable. The City appealed, and the appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

## I. MOTION IN LIMINE

The two officers stipulated in an internal investigation that they had violated police procedure. One officer consented to a 20-day suspension without pay, and the other officer consented to a 30-day suspension without pay. Prior to trial, the City filed a motion in limine to prevent any mention of the police procedure violation and punishment. The trial court excluded any mention of punishment, but permitted a limited amount of testimony concerning the officers' stipulation as to violating police procedure.

The City appeals the trial court's denial of its motion in limine and the admission of evidence at trial regarding the internal investigation report's conclusion that the officers violated police procedure.

"If a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue on appeal. . . . The failure to . . . object to the evidence at trial results in the issue not being preserved on appeal." *State v. Johnson*, 255 Kan. 252, Syl. ¶ 1, 874 P.2d 623 (1994).

At trial, when Jackson questioned the officers about whether the internal investigation report found they had violated police procedure or whether they had been disciplined for such violations, the City did not object. Because the City failed to object to evidence presented at trial which it tried to exclude through a denied motion in limine, the trial court's ruling on the motion in limine was not properly preserved for appeal. This issue fails.

## II. INSTRUCTION

The trial court provided the jury with the following instruction based on Restatement (Second) of Torts § 320 (1965).

"In the State of Kansas, police officers who take another into custody under circumstances that deprive the other of his or her normal power of self-protection, are under a duty to exercise reasonable care to control the conduct of third parties to prevent them from harming the one in custody if the police officers:
"1. know or have reason to know that they have the ability to control the conduct of the third person, and
"2. know or should know of the necessity and opportunity to exercise such control of the third person."

In the proposed instructions submitted by the City, the City requested that additional language, as found in *Washington v. State*, 17 Kan. App. 2d 518, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992), be included in the above instruction. This language provided:

"This duty to provide reasonable care to protect an inmate from violence is not violated in the absence of a determination that the danger was known, or, in the exercise of ordinary care, should have been known by a prison official. [Citations omitted.]" 17 Kan. App. 2d 518, Syl. ¶ 2.

The trial court did not include this additional language in its instructions to the jury. The City appeals the trial court's ruling.

Jackson points out that "[n]o party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he or she objects and the grounds of his or her objection unless the instruction is clearly erroneous." K.S.A. 60-251(b). *Bright v. Cargill, Inc.*, 251 Kan. 387, 409, 837 P.2d 348 (1992), *aff'd* 254 Kan. 853, 869 P.2d 686 (1994); see also *Leiker v. Gafford*, 245 Kan. 325, 358, 778 P.2d 823 (1989) (even if an objection to a verdict form is raised at a motion for a new trial, the party asserting error is still "in no position to assert reversible error in the verdict" if an objection to the verdict form or jury instructions was not noted at trial), *overruled in part on other grounds Martindale v. Tenny*, 250 Kan. 621, 629, 829 P.2d 561 (1992).

In the instruction conference, the City did not object to the trial court's version of the instruction or its failure to include the City's requested language. Except for its proposed instructions, the City made no mention of, or objection to, the instruction anywhere in

the trial. Thus, the City has waived its objection to this instruction on appeal unless the instruction is clearly erroneous.

"An instruction is clearly erroneous when the reviewing court reaches a firm conviction that, if the trial error had not occurred, there was a real possibility that the jury would have returned a different verdict." *Noon v. Smith*, 16 Kan. App. 2d 818, Syl. ¶ 2, 829 P.2d 922 (1992).

Although the additional language requested by the City would have made the instruction clearer, the instruction at issue is not clearly erroneous. It follows Restatement (Second) of Torts § 320. The additional language requested by the City adds nothing new to the Restatement language. This issue fails.

## III. DUTY TO MITIGATE DAMAGES

Jackson testified that shortly after he woke up from surgery to repair his neck injury, he called a family member to take him home from the hospital. He did so without the authorization of the physicians treating him. Jackson later returned to see a doctor to have the staples removed from his neck and to get some pain pills. He saw a doctor two to four times total in relation to his neck injuries. He did not seek treatment from a physician for the scar on his neck, nor did he seek help from a therapist, psychologist, or psychiatrist for the nightmares he had regarding this traumatic incident. Jackson simply consulted a family friend, who is a retired nurse, and she told him to use cocoa butter and hot towels on his neck after the staples were removed to reduce the scarring. Jackson utilized this home remedy and testified that it helped "tremendously" with the scarring.

In its proposed jury instructions, the City requested an instruction on the mitigation of damages pursuant to PIK Civ. 2d 9.42. This proposed instruction provided:

"If you find that Louis Jackson is entitled to recover damages for injury to his person, in fixing the amount thereof you should not include any loss which Louis Jackson could have prevented by reasonable care and diligence exercised by him after the loss occurred."

Finding no evidence which indicated that Jackson's medical injuries, expenses, or pain and suffering would have been any less had Jackson sought and followed traditional medical treatment for

his neck wound, the trial court refused to provide the jury with the mitigation instruction. The City appeals the trial court's ruling.

In *Theis v. duPont, Glore Forgan Inc.*, 212 Kan. 301, 307, 510 P.2d 1212 (1973), this court said:

" 'It is not infrequently said that it is the "duty" of the injured party to mitigate damages so far as that can be done by reasonable effort on his part. Since his legal position is in no way affected by his failure to make this effort, however, it is not desirable to say that he is under a "duty." His remedy will be exactly the same, whether he makes the effort and avoids harm or not. But if he fails to make the reasonable effort with the result that his harm is greater than it would otherwise have been, he cannot get judgment for the amount of this avoidable and unnecessary increase. The law does not penalize this inaction; it merely does nothing to compensate him for the harm that a reasonable man in his place would have avoided.' "

See *Home Life Ins. Co. v. Clay*, 13 Kan. App. 2d 435, 445, 773 P.2d 666, *rev. denied* 245 Kan. 783 (1989).

Here, Jackson presented evidence of the medical treatment he received—staples in his neck, removal of the staples, pain killers, a few check-up visits, and a home remedy to relieve the scarring. Most jurors are not familiar with having their throats cut. Most jurors do not know, through experience or common sense, whether any more medical procedures would have actually made Jackson's physical and emotional injuries less severe than they otherwise were. There is simply no evidence in the record regarding whether Jackson's condition was as good as it could get or whether better treatment could have improved his condition. Without sufficient evidence in the record that this later scenario was the case, as opposed to mere *speculation* that this was the case, the jurors were not entitled to determine whether Jackson properly had mitigated his damages. There is no evidence in the record to support the City's mitigation theory; thus, the City is not entitled to an instruction explaining its mitigation theory. This issue fails.

## IV. MEDICAL CARE

The City filed a motion in limine to preclude the introduction of evidence at trial regarding whether the officers unhandcuffed Jackson or provided Jackson with medical care once his neck was cut. Jackson alleged that such evidence was relevant to the issue

of pain, suffering, discomfort, and mental anguish and to show the sequence of events as they occurred on the night in question. Jackson argued that he did not intend to offer the challenged evidence to show that the officers owed and breached some additional duty to provide medical assistance.

The trial court considered the City's motion in limine and found that the evidence was admissible because it was relevant to pain and suffering and to the sequence of events. However, the trial court specifically stated that if the evidence was offered to prove the City was culpable in not providing medical treatment, then the evidence would be excluded. The trial court told the City that it would consider giving a limiting instruction to the jurors, which would inform them that the evidence regarding the officers' failure to provide Jackson with medical assistance was only relevant to the issues of pain and suffering or the sequence of events on the night in question and was not relevant to the issue of the officers' duty or culpability. The City did not draft or propose a limiting instruction.

When Jackson's attorney asked Officer Anderson at trial about the failure to unhandcuff Jackson or provide him with medical assistance, the City did not object. Further, the City did not object when Anderson answered that the officers had a duty to provide medical assistance. Finally, the City did not object when Jackson's attorney in closing argument referred to the officers' failure to unhandcuff Jackson. Thus, the trial court's denial of the City's motion in limine is not an issue which has been preserved for appeal. Moreover, when Jackson's attorney asked questions about the officers' failure to provide medical assistance, the City did not object. Thus, the trial court never had an opportunity to determine whether Jackson's attorney had committed error by questioning Anderson about an issue which the trial court had admitted on limited grounds. Since this issue was not presented or considered by the trial court, it will not be considered for the first time on appeal. This issue fails.

## V. DAMAGES

The jury awarded Jackson $158,500 in total damages. Specifically, the jury awarded Jackson $8,500 in economic damages (medical expenses) and $150,000 in noneconomic damages, with $100,000 of that amount designated as damages for pain and suffering. The City challenges the damages, claiming they are excessive. There are three sub-issues which will be discussed as they become relevant.

### A. Partially paid medical bills

During direct examination, Jackson testified about the amount of his medical bills. During cross-examination, the City's attorney questioned Jackson about the fact that he had not paid the full amount of the bills. The City did not state the actual amount of the bills which was still due and owing. Instead, the City confirmed that Jackson had paid a lesser amount than what was actually due and that this lesser amount was indicated on the billing. The three bills themselves were then admitted into evidence.

The first bill lists the amount due as $6,146.86 and the amount "due from patient" as $6,021.54, indicating that Jackson only paid $125.32 of this bill. The second bill lists an amount due of $339.50, with a handwritten note indicating that Jackson paid only $136.50, leaving an amount of $203. Finally, the third bill lists an amount due of $1,700, with a handwritten note indicating that Jackson only paid $1,194.50, leaving an amount of $505.50. It appears that Jackson's medical expenses to date totalled $8,186.36. However, Jackson only paid $1,456.32 of these medical bills. Some of these payments may have been made by the Kansas Crime Victims Fund. The jury awarded Jackson $8,500 in damages for his past and future medical expenses.

The City filed a motion for remittitur. The City claims that it should only be required to pay damages to Jackson in the amount that Jackson himself actually paid toward the bills. However, there is no evidence in the record that the hospital has settled for less than the amount due or has written off the remaining portion of the bills. The Crime Victims Fund may serve a lien on Jackson's

attorney to recover money the Fund paid for Jackson's medical expenses from the damage award Jackson will receive.

"When a verdict is challenged . . . as being contrary to the evidence, it is not the function of this court to weigh the evidence. . . . If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal." *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 361-62, 837 P.2d 330 (1992).

In this case there is no evidence that any of the amounts remaining due on the medical bills have been written off by the medical providers. The City stipulated to the admission of the medical bills without any limitation on that admission. The City did not offer any evidence from the medical providers to indicate that the remaining amounts due on the bills have been written off. When all the evidence and reasonable inferences therefrom are considered in the light most favorable to Jackson, it appears that Jackson still owes the full amount of the medical bills. The law does not require that Jackson's damages for medical expenses be reduced to the amount he actually paid since no evidence indicates the amount still owing on the bills have been written off by the medical providers. Instead, the evidence indicates that Jackson is still responsible to pay the full amount of the bills. This sub-issue fails.

## B. Damages Statement

After Jackson filed this action, the City requested that he file a statement of monetary damages pursuant to Supreme Court Rule 118 (1996 Kan. Ct. R. Annot. 148). Jackson filed such a statement, indicating that he sought damages in the amount of $200,000. Jackson apportioned this requested amount in the following manner: $10,000 for current and future medical expenses; $100,000 for permanent scarring; and $90,000 for pain, suffering, and mental anguish. Jackson has never sought to amend these requested amounts. At the conclusion of the trial, the jury awarded Jackson $100,000 in damages for pain and suffering, $10,000 more than the $90,000 Jackson requested for pain and suffering in his damages statement. The total amount of the damages awarded by the jury was $158,500, almost $50,000 less than the total amount of

damages requested in the damages statement—$200,000. The City contends that Jackson should be limited to the amount of pain and suffering damages that he requested—$90,000—and that the excess $10,000 should be deducted from Jackson's pain and suffering award. This issue was not raised at the time the verdict was read, at the time the motion for a new trial was heard, or at any other time until this appeal.

" '[A] point not presented to the trial court will not be considered for the first time on appeal.' " *Hephner v. Traders Ins. Co.*, 254 Kan. 226, 231, 864 P.2d 674 (1993); accord *Sharp v. State*, 245 Kan. 749, 753, 783 P.2d 343 (1989), *cert. denied* 498 U.S. 822 (1990) (a legal theory not presented to trial court may not be raised for the first time on appeal). This issue of whether the pain and suffering damages should be reduced to the exact amount of pain and suffering requested in the damages statement, even though the total amount of damages awarded was below the total requested amount, was not presented to the trial court and will not be considered for the first time on appeal. This issue fails.

## C. Excessive Damages

The jury awarded Jackson a total of $158,500—$8,500 in economic damages (medical expenses) and $150,000 in noneconomic damages, $100,000 of which included damages for pain and suffering. After this award was handed down, the City filed a motion for new trial and/or remittitur in which it claimed that the damage award was excessive under the circumstances of the case. The City asked the court to reduce the damage award to $50,000. The trial court refused to order a new trial or grant a remittitur. In so holding, the trial court stated:

"I can just imagine what the jurors must have felt when the plaintiff described his throat being stapled shut. I know what I felt when he described it. We have a case here that was within perhaps millimeters of a person's death. I can imagine what the jury must have thought about the psychological pressure that was exerted on the plaintiff. I know what I would have thought if I were he and watching the blood flow out and wondering whether I was going to survive another five minutes.

"When you get to the question of remittitur, I have to consider a lot more than just whether I thought the [verdict] was too high. I did not anticipate that the [verdict] would be that high to be quite honest about it. That doesn't mean it

shocks my conscience or it's without basis, because very often I miss the boat on what the jury is going to award. Sometimes I'm surprised how low it is, and sometimes I am surprised how high it is. Very seldom I can say that it is a product of passion [or prejudice] . . . ."

In arguing that the damages were excessive, the City cites to *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 352, 789 P.2d 541 (1990), *overruled in part on other grounds Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991), which discusses non-economic damages and lists factors that may be considered by a jury in awarding such damages. Applying these factors to this case, the City points out that Jackson was unemployed and thus did not lose time from work, his stay in the hospital was only a day, and the expenses amounted to $8,186.34. After initial recuperation, Jackson indicated that he could do everything he could before the incident except play basketball. Further, the scar on Jackson's neck has improved tremendously. Finally, the injury only occurred after Jackson beat up his girlfriend so that the police had to be called and he was arrested. Moreover, Jackson's injuries were exacerbated when his nephew shot him in the face a year after this injury occurred.

On the other hand, Jackson alleges that the jury award was not excessive. He points out that he had his throat cut from ear to ear while he was handcuffed. He then flopped around on the ground, watching his blood run down the street. The doctors sewed Jackson's neck muscles back together and then stapled his skin back together. The jury heard the testimony of Jackson when he described how he felt after he was injured. The jury saw the pictures of Jackson's wound. The jury observed Jackson's scar. There was no medical testimony offered by the City to indicate that the wound was not as bad as Jackson testified it was.

" 'Where a charge of excessive verdict is based on passion or prejudice of the jury but is supported solely by the size of the verdict, the trial court will not be reversed for not ordering a new trial, and no remittitur will be awarded unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court. Where the alleged passion or prejudice of the jury is not shown by definite proof, but depends for support solely on the size of the verdict, the award will be upheld unless it shocks the conscience of the court. There is no simple, symmetrical pattern or design for determining whether a verdict is suffi-

cient or insufficient, since each case must stand on its own facts.' " *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1031-32, 850 P.2d 773 (1993) (quoting *Leiker v. Gafford*, 245 Kan. 325, Syl. ¶ 10, 778 P.2d 823 [1989]).

The jury verdict does not shock the conscience of the court. This issue fails.

## VI. MOTION FOR SUMMARY JUDGMENT

Prior to trial, the City filed a motion for summary judgment. At a hearing on the motion, the parties agreed that there were no controverted facts. Both parties also agreed that there is a duty on the City and its agents to control the acts of third parties against persons being held in custody under certain circumstances. The City argued that summary judgment should be granted in its favor because, as a matter of law, those certain circumstances implicating a duty did not exist in this case.

The trial court found, based upon the uncontroverted facts, that the officers owed a duty to Jackson to act reasonably as a matter of law. The court ruled that the jury would need to determine whether the officers breached such duty. Thus, the trial court denied the City's motion for summary judgment. In so holding, the trial court stated:

"It seems to me the point involved in this motion is . . . did either of those officers know of the necessity or opportunity for exercising reasonable care there or should they have, that's the whole issue in this motion and I think that under the uncontroverted facts presented here, and that's all I can go on in this motion, that they should have known that, they should have been on guard. There was a possibility or it was foreseeable there could be a confrontation between these two people, No. 1. They answered a call on a domestic disturbance, they were investigating it. One of the individuals had blood on them. No charges had been filed. They didn't know who the suspect was, who the attacker was, who, quote, the victim was, at least, under the facts I have in front of me here, and they got these two people that obviously had been at each other and on top of that, after they were separated, you got a situation where one of them approached the other one and was told to get back, so I think they were on notice that something could have occurred here in the way of an altercation and because of that there is a duty here for the officers to act reasonably.

"Now, whether they breached that duty is something the jury is going to have to decide. Did they act reasonably under these circumstances? That's the whole question here for the jury and it seems to me, I asked the question earlier, what's the jury to decide. It seems to me after reflecting on this some more there's a lot

for the jury to decide. Did they act reasonably under these circumstances? And it seems to me whether they acted reasonably depends upon what they see as the foreseeability here of something happening. It's a matter of degree."

At this point, the City challenged the trial court's view of the uncontroverted facts. The City pointed out that Jackson was arrested for the battery of Davis. Thus, the City argued, the officers properly treated Davis as a victim and could not have foreseen that she would become an attacker. As such, the City claimed that the officers had no duty to protect Jackson from Davis. The trial court responded:

"Regardless of who was arrested or charged, I don't think that matters. The point was that they were at each other, there was a confrontation and there was no determination who started what and even if he wasn't the one that assaulted and she had not done anything, she was wounded, she was hurt. She approached him at one time and was told to get back. She did get back, but then she came back again, so I don't think it matters. I think there is a duty here. It does get a little bit confusing here when you talk about reasonable care, but I think there's a duty here sufficient to establish the factual question of whether reasonable care was exercised and I think that's what the jury is going to have to decide and you can argue to the jury, if you want, that and I'm sure you probably will. The officers didn't know—didn't hear any threats by this woman and, therefore, they did what was necessary here, but still I'm finding that even if they didn't hear any, there's facts sufficient here to establish that they owed a duty, so that's where we are.

"Now, if we get to trial, you know, facts may be such that I'm always open to a motion on the question of duty based upon the evidence that I heard, but as far as what I know here from the facts that you've stated in these two motions, uncontroverted facts, I'm finding there is a duty for the officers to have acted reasonably, so I guess that leaves us with a trial."

On appeal, the City challenges the trial court's denial of its motion for summary judgment. The City asserts summary judgment was appropriate because it did not owe a duty to Jackson in that the officers could not have foreseen the necessity to exercise control over Davis.

The duty which the officers owed to a person in custody is set out at Restatement (Second) of Torts § 320, which provides:

"One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third

persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor

"(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and

"(b) knows or should know of the necessity and opportunity for exercising such control."

*Washington v. State*, 17 Kan. App. 2d 518, 523-24, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992), expounds upon this Restatement by stating:

"By application of the duty defined in Restatement (Second) of Torts § 320, the State does not become the insurer of the safety of a prisoner. The State only becomes liable in the event that damage proximately results from a failure to exercise reasonable care to prevent harm. Again, this duty to provide reasonable care to protect an inmate from the violence is not violated in the absence of a determination that the danger was known or, in the exercise of ordinary care, should have been known by a prison official."

The City concedes that most of the elements in the Restatement which are necessary to create a duty did in fact exist in the situation at issue. For instance, the officers did voluntarily take custody of Jackson. The officers handcuffed Jackson's hands behind his back and sat him on a street curb, *i.e.*, in a helpless position, thereby depriving him of his normal power of self-protection. Further, under subsection (a), the officers knew or had reason to know that they had the ability to control Davis' conduct. However, the City contends that subsection (b) of the Restatement is not satisfied because the officers did not know or could not have known of the *necessity* or opportunity to exercise control over Davis. This is because Davis, a victim of battery at the hands of Jackson, made no threats against Jackson in the presence of the officers, and Jackson never informed the officers that Davis might have a weapon or might harm him.

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. . . . On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

Jackson sued the City for negligence. Negligence requires a duty which, once it is breached, proximately and actually causes an injury. *Dietz v. Atchison, Topeka & Santa Fe Rwy Co.*, 16 Kan. App. 2d 342, 345, 823 P.2d 810 (1991), *rev. denied* 250 Kan. 804 (1992). The determination of whether a duty exists is a question of law to be decided by the court, not the jury. See *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1993). According to the Restatement (Second) of Torts § 320, the officers owed a duty to Jackson if several conceded factors existed and if the officers knew or should have known "of the *necessity* and opportunity for exercising . . . control" over Davis. The officers could have only known of the necessity to exercise control over Davis if they could have *foreseen* her aggressive conduct. Thus, under this analysis, we must decide if the officers could have foreseen danger to Jackson in order to determine if the officers had a duty to protect Jackson.

Three Kansas cases have analyzed the duty owed to a person in custody—*Washington v. State*, 17 Kan. App. 2d 518; *C.J.W. v. State*, 253 Kan. 1, 853 P.2d 4 (1993); and *Cupples v. State*, 18 Kan. App. 2d 864, 861 P.2d 1360 (1993). An analysis of these cases sheds some light on the above problem.

In *Washington*, the plaintiff was in custody at the Lansing Correctional Facility when he got into a fight with another inmate, Vaughn. Both men were placed in special confinement. Vaughn made several threats against Washington in the presence of the prison guards. Upon release from special confinement, both men were assigned to the same cell block, four cells away from each other, even though other empty cells were available. On this same day, Vaughn stabbed Washington in the eye, causing irreparable damage.

Vaughn sued the State for negligence, alleging that the State's agents, the prison guards, knew Vaughn would try to harm Washington, yet they assigned the two to the same cellhouse without warning and did not try to protect Washington. The State filed a motion for summary judgment, arguing, *inter alia*, that the prison guards did not breach a duty owed to Washington. The trial court concluded that the State did owe a duty to Washington to protect him from Vaughn, but the trial court granted the State's motion

for summary judgment on other grounds. Washington appealed, and the State cross-appealed regarding the duty of care owed by the State to Washington.

On appeal, the Court of Appeals considered the issue of whether "the State ha[d] a duty under Restatement (Second) of Torts §§ 315-320 [1965] to exercise reasonable care to control Vaughn and prevent him from harming Washington because of its special relationship with Washington." 17 Kan. App. 2d at 521. The *Washington* court pointed out that absent a "special relationship," no duty exists to control the conduct of third persons in order to prevent harm to others. However, such a special relationship does exist between persons who have custody of another and the person who is in custody. 17 Kan. App. 2d at 522. In analyzing this issue, the Court of Appeals stated:

"In resolving the question of what duty is owed Washington, we conclude the duty defined in Restatement (Second) of Torts § 320, quoted above, most closely reflects the relationship of the parties and should be applied to the penitentiary setting to define the duty owed by the State to control a prisoner and prevent harm to another prisoner. In the absence of a statute, nearly all courts that have considered the matter have concluded that *prison officials owe a duty of ordinary or reasonable care to safeguard a prisoner in their custody or control from attack by other prisoners. This duty to provide reasonable care to protect an inmate from violence is not violated in the absence of a determination that the danger was known or, in the exercise of ordinary care, should have been known by a prison official.* [Citations omitted.] By application of the duty defined in Restatement (Second) of Torts § 320, the State does not become the insurer of the safety of a prisoner. The State only becomes liable in the event that damage proximately results from a failure to exercise reasonable care to prevent harm. Again, *this duty to provide reasonable care to protect an inmate from violence is not violated in the absence of a determination that the danger was known or, in the exercise of ordinary care, should have been known by a prison official.*

"Whether a duty has been breached is a question of fact. *Durflinger*, 234 Kan. at 488. Application of the duty set forth in Restatement (Second) of Torts § 320 and the aforementioned cases suggests that, because *Washington was in the custody of prison officials when threatened by Vaughn and officials allegedly knew of that threat and had knowledge of Washington's fight with Vaughn, those officials had a duty to exercise reasonable care to control Vaughn and prevent him from harming Washington. Whether the State breached its duty to Washington is a question of fact which should be submitted to a trier of fact.*" 17 Kan. App. 2d at 523-24.

In *C.J.W. v. State*, the plaintiff, a 12-year-old boy, was being held in a juvenile detention center when he was assaulted, raped, and sexually molested by another older youth named Randy, who was also being held at the juvenile detention center. SRS had a well-documented history of Randy's abuse towards younger boys, including a label as a "rapist" by one youth facility. Upon learning of Randy's detention at juvenile hall, SRS talked with officials at the hall but did not provide the hall with any information regarding Randy's history or any preventive measures that should be taken to protect other detainees. Based on these circumstances, C.J.W. sued the State for negligence. The State filed a motion for summary judgment, which the trial court granted, finding that no legal duty existed on the part of the State to protect C.J.W. from Randy. C.J.W. appealed. The Court of Appeals affirmed the trial court, and C.J.W. filed a petition for review, which this court granted.

The issue on appeal, among others, was "whether the State owed [C.J.W.] a duty to warn of Randy's violent and sexual propensities and to protect him from Randy." 253 Kan. at 7. Citing Restatement (Second) of Torts §§ 319-320 and *Washington*, this court reversed the Court of Appeals and the trial court's grant of summary judgment. In holding that the State had a duty to protect C.J.W. from Randy, this court stated:

"The justification for the application of §§ 319 and 320 to the facts of this case is much more obvious than in . . . *Washington*. Here a 12-year-old child was taken into custody by juvenile officials and placed at the mercy of a 17-year-old bully who had a long history of violent and sexually deviant acts toward others, all of which was known to juvenile officials of the State and SRS. Children who are taken into custody should be protected from others in custody and the duty to children such as the plaintiff is more compelling than that due . . . the [plaintiff] in . . . *Washington*. We have no hesitancy in concluding that §§ 315, 319, and 320 of the Restatement (Second) of Torts apply to this case and that the State not only had a duty to warn the officials of Juvenile Hall of Randy's propensities to commit violence but also to take reasonable steps to protect plaintiff from Randy. Whether the State breached its duty to plaintiff remains to be determined in subsequent proceedings." 253 Kan. at 12.

In *Cupples v. State*, 18 Kan. App. 2d 864, the plaintiff was incarcerated at the Kansas State Correctional Facility. While incarcerated, two inmates threatened her. She reported these threats to

the guards. The guards were told to keep a close watch on these two inmates. Neither inmate ever attacked Cupples or made any further threats. Later, Cupples discussed her attraction to another inmate with a counselor, but she stated she never felt any reason to fear this inmate. The incident in question arose because Cupples had voluntarily gone to visit the cell of an inmate who had previously threatened her. While visiting the cell, another inmate, Young, came into the cell. Young and Cupples got into an altercation and Young punched Cupples, causing her to go blind. Cupples said that she had not expected Young to hit her. At the time of the altercation, the correctional officer was temporarily gone from the cell unit because he was in a conference with the counselor. According to prison policy, no substitute security was provided during the officer's absence.

Based on this incident, Cupples sued the State for negligence and alleged a § 1983 claim. The State filed a motion for summary judgment which the trial court granted. Cupples appealed.

One issue on appeal was whether the State owed a duty to Cupples to protect her from Young. Interpreting *Washington*, 17 Kan. App. 2d 518, the *Cupples* court ruled that the question of whether the State owes a duty to a prisoner is determined by whether the danger was known by a prison official or should have been known in the exercise of ordinary care. In other words, a State's duty to protect an inmate hinges on the foreseeability of the harm. 18 Kan. App. 2d at 874. Further, the *Cupples* court pointed out that in determining the existence of a duty, not only should the foreseeability of the injury be considered, but also the foreseeability of the action leading up to the injury should be considered, *i.e.*, it might be foreseeable for one prisoner to injure another by punching, but not foreseeable for one prisoner to remove a cylinder of acid from a fire extinguisher and pour the acid over the head of the sleeping prisoner. 18 Kan. App. 2d at 877.

From this analysis, the court concluded that Young's attack on Cupples was not foreseeable. Hence, the court ruled that the State owed no duty to Cupples to protect her from the attack. The court affirmed the trial court's grant of summary judgment on behalf of the State. In so holding, the court stated:

"It is important to remember that Cupples admitted that she did not expect Young to hit her. Cupples had no problems with McVey after the previously reported threat, and their relationship was such that Cupples felt comfortable enough to go to McVey's cell without an invitation. There was no report to any guard, correctional officer, or counselor about any threat from Young, nor was there any evidence from which the State should have anticipated Young's attack on Cupples. There is no evidence the defendants knew or should have known that Young had focused on Cupples and intended to harm her.

. . . .

"In the final analysis, our decision may also be based on the fact the injury to Cupples was not foreseeable by the defendants. Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. [Citation omitted]. *An injury is foreseeable so as to give rise to a duty of care* where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm. *Huston v. Konieczny*, 52 Ohio St. 3d 214, 217, 556 N.E.2d 505 (1990).

" . . . ' "[W]hether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law." ' 253 Kan. at 583. There is no factual basis in our case for finding it foreseeable that Young would attack Cupples. This is the only conclusion which reasonable persons would reach.

"Thus, whether we test the trial court's ruling by the test required by *Washington* or that of *C.J.W.*, we reach the identical conclusion that requires the trial court's ruling on the summary judgment motions to be affirmed.

"There is no factual basis for finding the State owed Cupples the duty to protect her from Young, and, where no specific duty is owed, the State is required only to exercise reasonable and ordinary care to prevent attacks by other inmates. *Washington*, 17 Kan. App. 2d at 523. No breach of duty occurred because there was no way the defendants knew or should have known the danger existed.

"We hold, as a matter of law, that Cupples has failed to show that a special duty existed on the part of the defendants to protect her from an unanticipated and unexpected attack by Young. We also hold it was not foreseeable under the circumstances that Young would attack Cupples." (Emphasis added.) 18 Kan. App. 2d at 878-80.

Here, the police were in an unlit area. There had been a fight, leaving at least one party battered and bleeding. Both people involved had consumed alcohol. The police were aware that domestic disturbances are volatile, and they had been trained to keep the parties in a domestic disturbance apart to prevent one party from

attacking the other. They had placed Jackson in a position where he could not defend himself, thereby heightening their duty to Jackson. They were aware that Davis, for an unknown reason, had previously attempted to approach Jackson from the rear as he sat on the curb. By the time Jackson was attacked, the officers should have reasonably foreseen the danger Davis might pose to Jackson, and they should have reasonably foreseen the necessity to protect Jackson, from a possible attack by Davis. The trial court properly determined that the officers owed a duty to Jackson to protect him from Davis. We conclude the trial court did not err in denying the City's request for summary judgment. The case was properly submitted to the triers of facts, who concluded the officers breached their duty to reasonably protect Jackson from harm.

Affirmed.