THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VILAYSANH CHANTHALOTH, Defendant-Appellant.

Second District No. 2—98—1247

Opinion filed January 12, 2001.—Rehearing denied February 22, 2001.

G. Joseph Weller and R. Christopher White, both of State Appellate Defender's Office, of Elgin, for appellant.

Douglas P. Floski, State's Attorney, of Oregon (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Mary Ellen Dienes, of Des Plaines, for the People.

JUSTICE HUTCHINSON delivered the opinion of the court:

In June 1995 defendant, Vilaysanh Chanthaloth, was charged by indictment with the offenses of first-degree murder (720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West 1994)), residential burglary (720 ILCS 5/19—3 (West 1994)), and home invasion (720 ILCS 5/12—11(a)(2) (West 1994)). Following a jury trial, the jury acquitted defendant of the murder charges but found him guilty of committing the offenses of residential burglary and home invasion. The trial court sentenced defendant to an extended 40-year prison term on the conviction of the offense of home invasion and a consecutive 4-year term on the conviction of the offense of residential burglary. Defendant appeals his convictions and sentences. We affirm in part, vacate in part, and remand.

The victim in the present case is Bryce Dauenbaugh, who was 74 years old, suffered from diabetes, poor eyesight, and high blood pressure, and took insulin injections and other medications. His left leg had been amputated approximately four to five inches below the knee. The victim kept cash and important papers in a steel box in the bedroom of his home; he also kept two rifles and a handgun in the house. During the early morning hours of February 17, 1995, defendant and two others entered the victim's residence, beat the victim, and took his cash and weapons. The victim died as a result of the beating.

Lance Dauenbaugh, the victim's son, testified at trial that, one or two weeks prior to the victim's death, he looked in the box and observed that it contained approximately $3,600 in cash, mostly in $100 bills. In February 1995 Lance was planning a vacation in Florida. During his absence, he arranged for a friend, Teresa O'Connor, to look after his father.

Teresa O'Connor testified that she checked in on the victim while Lance Dauenbaugh was in Florida. On February 16, 1995, O'Connor stopped in to see the victim and stayed for approximately 15 minutes. The following day she went to the victim's house at approximately 4 p.m. As she entered the house, she noticed that the house was cold and papers were strewn on the floor. She could see a metal box and a screwdriver on the kitchen table. O'Connor called out the victim's name and, receiving no response, called 911. She remained at the victim's house until the police arrived. On cross-examination, O'Connor recalled that the victim did not lock his doors.

Richard Wilkinson, Ogle County chief deputy sheriff, testified that on February 21, 1995, he and Officer Clint Myers interviewed defendant. Wilkinson noticed that defendant's hands were swollen and bruised; defendant told him that he had a fight with his girlfriend. Wilkinson told defendant that he had earlier spoken with Daniel Weeks, another suspect, and recounted Weeks's version of the events to defendant. Defendant agreed to give an audiotaped statement to Wilkinson.

Defendant's statement reflected that, on the night of February 16, 1995, he and Jayson Spriggle were in a bar until 1:30 a.m. While at the bar, defendant and Spriggle played pool and drank alcohol. He and Spriggle left the bar because defendant ran out of money. Spriggle told defendant that he wanted to get some money and that he knew of a place where he could get money. Spriggle told defendant that he did not know where it was but that Weeks knew where it was. After leaving the bar, they picked up Weeks because he knew where the victim lived. Defendant told the officers that he was "so drunk man."

While they were talking about the money, defendant asked Spriggle whether it would be necessary to hurt the man. Spriggle responded that they would just go in. After they picked up Weeks, they drove to the victim's house. Defendant told the officers that Weeks was "straight," but that he and Spriggle were "wasted big time."

When they arrived at the victim's house, the door was open. Weeks entered first because he was familiar with the house. The victim awoke and asked who was there. The victim saw defendant, and defendant told Weeks and Spriggle that the victim needed to be put in a room. Defendant told the officers that he was not abusive to the victim, but as he attempted to tie up the victim with wires from the vacuum cleaner, the victim was screaming, so defendant hit him twice. Spriggle also hit the victim; they all tried to tie up the victim but were unsuccessful. They were unable to move the victim into the bathroom but only to the side of the bathroom. When asked who hit the victim, defendant told the officers that he thought Spriggle hit him with the gun. Defendant also told the officers that no one kicked the victim and no weapons were involved. Defendant, Spriggle, and Weeks left with guns and approximately $3,000 cash, which they divided equally. Upon leaving the scene, defendant drove into a ditch. Because of the accident, defendant needed to replace the windshield and trade tires.

Officer Myers testified that he responded to a 911 call and proceeded to the victim's house. When he entered the victim's residence, he noticed clothes in the hallway that appeared to be stained with blood, some shoe prints, and blood on the tile floor. He saw the victim with his head and shoulder area up against the bathroom door

and his leg propped up against the bathtub. The victim's body contained bruises to his back area as well as some type of trauma to the skull area. The victim was covered in blood, and a shirt was tied off to the toilet seat. There was also an electric cord under the victim.

The State's next witness was Mary Hopp, who testified that, between 3:30 and 4 a.m. on February 17, she was delivering copies of the Rockford Register Star. During her route, she noticed a car in the field. She stated that the car was "light colored" and there were some people in front of the car. She said the car was approximately 100 feet from the road. She continued her route and called the police to get them some help.

Anisa Jackowski, defendant's girlfriend, testified that, on the night of February 16, 1995, she and defendant had an argument. She went into the bathroom, and defendant pounded on the bathroom door "really hard" several times. Defendant left, and when Jackowski went to bed at approximately 11 p.m., defendant had not yet returned. She awoke at approximately 5:30 a.m. when she heard a "thumping noise" coming from the basement. Jackowski went down to the basement and she saw shoes and clothes in the dryer. Defendant and Spriggle were present. Jackowski went back to bed and woke up at 9 a.m. Defendant and Spriggle were still in the house. She noticed that the car, which belonged to defendant's mother, was in the driveway and had a cracked windshield. Defendant and Spriggle left in the car, and when they returned a couple of hours later, the windshield was fixed.

Jackowski further testified that defendant was acting differently and was quieter than usual. When she asked him why he was behaving differently, defendant recounted to her what had happened. Defendant told Jackowski that they took approximately $3,000 and split it three ways. Defendant showed her eight $100 bills.

Jackowski testified that defendant told her he needed to dispose of his clothes and guns and she offered to help him. She saw defendant try unsuccessfully to burn some gloves. They also drove toward Wisconsin, where they threw the guns in a river near Beloit, Wisconsin. She told defendant that, if questioned, she would say she was with him at the time of the incident. She also noticed that his nose was bruised and had some blood on it and his hand looked swollen. Defendant further told her that Spriggle struck the victim with a rifle. Defendant told her that he did not beat the victim. Jackowski testified that defendant was still drunk when she saw him in the early morning hours of February 17, 1995.

Scott Roach testified that he had known defendant for approximately 10 years. Roach and defendant worked together at Reliability Machine at the time of the incident. Defendant asked Roach if

he wanted to trade tires with him because he was taking a trip to see his family in Janesville. Defendant offered Roach approximately $30 for the tires, and Roach accepted.

Dr. Larry Blum, a forensic pathologist, testified regarding the extent of the victim's injuries, which included external injuries as well as signs of heart disease. Blum opined that the victim died of "head and neck trauma due to multiple blunt force injury resulting from a beating." He testified that he found no evidence of stabbing, strangulation, or smothering.

Bonnie Toms testified that, on the night of February 17, 1995, she was at a party where she saw Weeks. She spoke with him for a few minutes about money. During the conversation, Weeks showed her his wallet, which contained so much cash he could not close it. Weeks had another stack of $100 bills sticking out of his coat pocket. She testified that she had never seen Weeks with that much cash before.

Michael Lockinger testified on behalf of defendant. Lockinger was a former bouncer of a nightclub and had often seen people who were intoxicated. He testified that he saw defendant at approximately 11 p.m. on February 16, 1995, at a bar. He spoke with defendant and determined from observing him that he was very drunk. At approximately 1:30 a.m., Lockinger told defendant that he should not be driving.

Defendant also testified regarding his version of the events of February 16 and 17, 1995. His testimony was substantially similar to that of the officers to whom he offered his statement. Upon returning home, he and Spriggle washed their clothes. Defendant later passed out and could not recall when he awoke. Later on February 17, defendant and Spriggle fixed the windshield and changed the tires. Defendant later discussed the incident with his girlfriend. He told her that he, Spriggle, and Weeks went to Oregon to get some money. He told her that Spriggle had told him that, after defendant and Weeks went to the car, Spriggle returned to the house, got into a fight with the victim, and hit him with a gun.

The parties held an instructions conference and defendant tendered proposed instructions on the affirmative defense of voluntary intoxication. At the conference, the State argued that defendant possessed the presence of mind to form the specific intent to commit the offenses of home invasion and residential burglary. The State further argued that defendant admitted that they planned to drive to the victim's residence to commit a burglary; he drove his car through the City of Rockford obeying traffic laws, stop signs, and traffic lights and did not draw the attention of the police; he drove from Rockford to a rural area of Oregon with no obstacles; and he had the presence of

mind prior to the crime to ask Weeks for a glove so he would not leave fingerprints. The State also argued that defendant's testimony reflected that he had a clear and absolute recollection of the events that occurred.

The trial court ruled that defendant's intoxication was not so extreme as to suspend his power of reason and render him incapable of forming a specific intent. Speaking also to defendant's request for a second-degree murder instruction based on voluntary intoxication, the trial court relied on *People v. Smith*, 124 Ill. App. 3d 720 (1984), and ruled that voluntary intoxication would not reduce the crime of first-degree murder to second-degree murder. Defense counsel then tendered the trial court a voluntary intoxication instruction, which stated:

> "A voluntarily intoxicated person is criminally responsible for his conduct unless his intoxication is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense of first [degree] murder, second degree murder, involuntary manslaughter, home invasion, residential burglary and criminal trespass to residence."

See Illinois Pattern Jury Instructions, Criminal, No. 24—25.02 (4th ed. 2000).

Following arguments of counsel, the trial court rejected defendant's proposed instruction. Thereafter, the parties gave their closing arguments and the trial court instructed the jury. The jury acquitted defendant of the charge of murder but convicted him of both home invasion and residential burglary. The trial court sentenced defendant to an extended term of 40 years' imprisonment for the offense of home invasion and a consecutive term of 4 years' imprisonment for the offense of residential burglary. Following the denial of defendant's post-trial motion, defendant timely appeals.

■ Defendant first contends that the trial court erred when it refused to instruct the jury on the affirmative defense of voluntary intoxication because substantial evidence existed demonstrating his intoxication. In Illinois, voluntary intoxication is a defense if the defendant can demonstrate that she or he, as a result of the intoxication, was unable to form the specific intent necessary for the crime. 720 ILCS 5/6—3 (West 1998); *People v. Crosby*, 243 Ill. App. 3d 1083, 1085 (1993). Merely being drunk or intoxicated is insufficient to create a defense. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 1082 (1993). A trial court is vested with the discretion to determine whether to tender or refuse to tender a defense instruction on intoxication. *People v. Arnold*, 104 Ill. 2d 209, 214 (1984).

We find the recent case of *People v. Smith*, 195 Ill. 2d 179 (2000),

instructive. In *Smith*, the defendant sought an intoxication defense to reduce his legal culpability based on his ingestion of drugs and alcohol at the time of the murder. Our supreme court stated that, even if the jury believed that the defendant had ingested drugs on the day of the murder, it could not conclude that the defendant did not intend to cause the death of the victim. *Smith*, 195 Ill. 2d at 195. The *Smith* court considered the defendant's statement to the police, including his ability to recall the events of the murder when he was giving his statement to the police, and testimony from other witnesses. The *Smith* court noted that the defendant's evidence regarding his intoxication was speculative and inconclusive and, in affirming his conviction, concluded that the defendant's intent was apparent from the evidence presented. *Smith*, 195 Ill. 2d at 196-97.

In the present case, defendant's voluntary intoxication defense is not supported by the evidence. The record shows that defendant was consuming alcohol on the night of the crime. However, defendant failed to present sufficient evidence that his intoxication was so extreme that he could not act in such a way as to commit the offenses of home invasion and residential burglary. Defendant was the operator of the vehicle; defendant drove from Rockford to the victim's home in rural Oregon. Defendant admitted that he drove with the purpose of going to the victim's home and taking his money. Defendant admitted that he entered the victim's home and took part in beating the victim. Afterward, defendant had the presence of mind to flee the scene, change his dirty and bloodied clothes, repair the cracked windshield, and trade his tires. After defendant committed the offenses of which he was later convicted, he related the events to Jackowski. Days later he gave a detailed statement to police, discussing the events occurring before, during, and after the murder.

If the record indicates that a defendant acted with any purpose or rationality, the defense of voluntary intoxication is not available. *People v. McCoy*, 281 Ill. App. 3d 576, 584 (1996), citing *People v. Martin*, 233 Ill. App. 3d 466, 468 (1992). Our review of the record in the present case and the relevant case law persuades us defendant's testimony presented no reasonable likelihood that he established the defense of voluntary intoxication. Accordingly, we hold that the trial court's refusal to tender the voluntary intoxication jury instruction was not an abuse of discretion.

Defendant next contends that his conviction of and sentence for the offense of residential burglary should be vacated because residential burglary is a lesser-included offense of home invasion. Defendant relies on *People v. McLaurin*, 184 Ill. 2d 58 (1998), in support of his contention. A defendant is prejudiced when more than one

offense is carved from the same physical act. *People v. King*, 66 Ill. 2d 551, 566 (1977). When a judgment is entered upon a defendant who is convicted of two crimes arising from one act, the rule in Illinois is that the conviction of the more serious offense will stand and the conviction of the less serious offense must be vacated. *People v. Garcia*, 179 Ill. 2d 55, 71 (1997). The *McLaurin* court determined that the offenses of residential burglary and home invasion were predicated upon the same physical act—an unauthorized entry into the victim's home—and vacated the defendant's conviction of and subsequent sentence for the offense of residential burglary. *McLaurin*, 184 Ill. 2d at 106.

■ The State confesses error on this issue and acknowledges that the offenses of home invasion and residential burglary were carved from the same physical act of entering the victim's residence. Pursuant to the State's confession of error and under the principles enunciated in *McLaurin*, we vacate defendant's conviction of and sentence for residential burglary. Defendant's conviction of the more serious offense, home invasion, will stand.

In his supplemental brief on appeal, defendant challenges as unconstitutional the statute authorizing the trial court to impose an extended-term sentence. Defendant was convicted of home invasion, a Class X felony. Ordinarily, a Class X felony carries a term of 6 to 30 years' imprisonment (see 730 ILCS 5/5—8—1(a)(3) (West 1998)), but an offender subjected to extended-term sentencing may be sentenced to 30 to 60 years' imprisonment (see 730 ILCS 5/5—8—2(a)(2) (West 1998)). The trial court determined that statutory aggravating factors were present that subjected defendant to an extended-term sentence under section 5—8—2 of the Code (see 730 ILCS 5/5—8—2(a)(2) (West 1998)). The trial court sentenced defendant to an extended term of 40 years' imprisonment. The trial court found that three aggravating factors were present: (1) the crime was exceptionally brutal and heinous (see 730 ILCS 5/5—5—3.2(b)(2) (West 1998)), (2) the victim was over the age of 60 (see 730 ILCS 5/5—5—3.2(b)(4)(ii) (West 1998)), and (3) the victim was physically handicapped at the time of the offense (see 730 ILCS 5/5—5—3.2(b)(4)(iii) (West 1998)). Defendant argues that his extended-term sentence must be vacated in light of the United States Supreme Court decision of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

■ In *Apprendi*, the Supreme Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty beyond the otherwise prescribed statutory maximum where the judge found by a preponderance of the evidence that certain aggravating factors were present. The defendant Apprendi had been indicted on 23 counts relating to four separate shootings and the unlawful possession

of various firearms. As part of a plea agreement, Apprendi pleaded guilty to two counts of unlawful possession in the second degree and one count of unlawful possession in the third degree. Under New Jersey law, a conviction of a second-degree crime carries a penalty of 5 to 10 years. The prosecution moved to enhance Apprendi's sentence on one of the counts of unlawful possession in the second degree under New Jersey's "hate crime" statute. The trial court found, by a preponderance of the evidence, that Apprendi had acted with a purpose to intimidate, a finding that enhanced his sentence to 10 to 20 years. The trial court sentenced Apprendi to 12 years on that count with the sentences on the other two counts to run concurrently. The Supreme Court of New Jersey affirmed Apprendi's sentence. The United States Supreme Court reversed and held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

Prior to *Apprendi*, the Supreme Court's most recent decision in this area was *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999). In *Jones,* the Court considered a challenge to a conviction under the federal carjacking statute (18 U.S.C. § 2119 (1994)). The Court determined that, given the structural uncertainty as to whether the injury or death of a victim was a sentencing factor or an element of an independent crime, the doctrine of constitutional doubt required that the courts interpret the provisions as establishing separate crimes, all elements of which had to be proven to a jury beyond a reasonable doubt. Similarly, in *Castillo v. United States*, 530 U.S. 120, 147 L. Ed. 2d 94, 120 S. Ct. 2090 (2000), the Court construed an ambiguous statute as setting out separate offenses rather than a single offense with sentencing factors. The Supreme Court's analysis in these cases examined the structure of the statute at issue, the legislative history, and whether courts historically considered a particular fact during the sentencing phase.

In a footnote to *Jones*, the Court foreshadowed its eventual holding in *Apprendi* by noting that, "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243 n.6, 143 L. Ed. 2d at 326 n.6, 119 S. Ct. at 1224 n.6. The Supreme Court, however, stated that its opinion "does not announce any new principle of constitutional law, but merely interprets a particular federal statute in light of a set of constitutional concerns that have emerged through a series of our decisions over the past

quarter century." *Jones*, 526 U.S. at 251 n.11, 143 L. Ed. 2d at 331 n.11, 119 S. Ct. at 1228 n.11. Given the clear legislative intent of our extended-term sentencing statute (see 730 ILCS 5/5—8—2 (West 1998)) and the uncertain mandate of *Jones*, this court would have been hesitant to overturn our well-established precedent that the age of a victim, the physical impairments of a victim, and whether a particular crime was brutal and heinous were aggravating factors used to sentence a defendant to an extended term of imprisonment and not elements of the offense. See *People v. White*, 241 Ill. App. 3d 291 (1993) (age); *People v. Jackson*, 216 Ill. App. 3d 1 (1991) (impairment); *People v. Hood*, 262 Ill. App. 3d 171 (1994) (brutal or heinous behavior). However, *Apprendi* compels us to reconsider.

This case presents the question whether the factors considered here are aggravating factors that may be used to sentence a defendant to an extended term of imprisonment or elements of the offense. We conclude that there is no reasonable construction of our extended-term sentencing statute (see 730 ILCS 5/5—8—2 (West 1998)) that would allow us to avoid the broad constitutional rule of *Apprendi*. Notwithstanding prior precedent of this court and our state supreme court that our legislature did not intend for these conditions to be elements of an offense, we must now hold that they are. This result is consistent with other recent rulings by our reviewing courts. See *People v. Joyner*, 317 Ill. App. 3d 93, 109 (2000) (finding that the trial court violated sentencing procedures under *Apprendi* when it determined that the defendant's conduct was "exceptionally brutal and heinous" and imposed an extended-term sentence upon the defendant); *People v. Beachem*, 317 Ill. App. 3d 693 (2000) (applying *Apprendi* to postconviction petitions); *People v. Clifton*, 321 Ill. App. 3d 707 (2000) (stating that, when consecutive sentences are to be imposed pursuant to a factual finding that severe bodily injury occurred, then severe bodily injury will have to be submitted to a jury and proved beyond a reasonable doubt); see also *People v. Carney*, 317 Ill. App. 3d 806 (2000) (following *Clifton*).

The answer to the narrow question presented, whether the defendant's sentence was permissible, given that it exceeds the maximum for the offense charged, was foreshadowed by the holding in *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999), that, with regard to federal law, the fifth amendment's due process clause and the sixth amendment's notice and jury trial guarantees (U.S. Const., amends. V, VI) required that any fact other than a prior conviction that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt. The fourteenth amendment com-

mands the same answer when a state statute is involved. U.S. Const., amend XIV. The fourteenth amendment right to due process and the sixth amendment right to trial by jury, taken together, entitle a criminal defendant to a jury determination that the defendant is guilty beyond a reasonable doubt of every element of the crime charged. The historical foundation for these principles extends down centuries into the common law. The Court explained: "At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without 'due process of law,' Amdt. 14, and the guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury,' Amdt. 6." *Apprendi*, 530 U.S. at 476-77, 147 L. Ed. 2d at 447, 120 S. Ct. at 2355. Quoting *United States v. Gaudin*, 515 U.S. 506, 510, 132 L. Ed. 2d 444, 449, 115 S. Ct. 2310, 2313 (1995), the Court reasoned: "Taken together, these rights indisputably entitle a criminal defendant to 'a jury determination that [she or he] is guilty of every element of the crime with which [she or he] is charged, beyond a reasonable doubt.' " *Apprendi*, 530 U.S. at 477, 147 L. Ed. 2d at 447, 120 S. Ct. at 2355-56.

The statutory aggravating factors such as the age of the victim, the physical impairments of the victim, and whether a crime was brutal and heinous are critical to the statutory enhanced sentencing provisions in section 5—8—2 of the Code (see 730 ILCS 5/5—8—2 (West 1998)). Subsection 5—8—2(a)(2) of the Code allows a trial court to sentence a convicted offender to a prison term not less than 30 years and not more than 60 years upon its finding that certain statutory aggravating factors were present. 730 ILCS 5/5—8—2(a)(2) (West 1998). The structure of section 5—8—2 is similar to that described by Justice Thomas in his concurrence in *Apprendi*: "[I]f the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, *** the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime." *Apprendi*, 530 U.S. at 501, 147 L. Ed. 2d at 462, 120 S. Ct. at 2368-69 (Thomas, J., concurring).

■ In the present case, the trial court's determinations were made by it outside the presence of the jury and after the jury had rendered its verdict. At defendant's sentencing hearing, the trial court specifically found that the crime was exceptionally brutal and heinous indicative of wanton cruelty, the victim was over the age of 60 years, and the victim was physically handicapped. The trial court further stated that it based its determination of defendant's extended-term sentence upon

those factors. As a result of the trial court's findings, defendant received an extended-term sentence of 40 years—10 years greater than the maximum Class X sentence permitted under section 5—8—1(a)(3) (see 730 ILCS 5/5—8—1(a)(3) (West 1998)). We note that the State presented testimony concerning the victim's age to the jury, and that factor was not challenged by the defense. Therefore, under a strict interpretation of *Apprendi,* the age of the victim was an element of the aggravating offense that was submitted to a jury and proved beyond a reasonable doubt. However, because the trial court considered not only the victim's age but also the victim's disability and the nature of the crime that defendant committed, we are constrained to vacate defendant's extended-term sentence pursuant to the United State Supreme Court's holding in *Apprendi.* On remand defendant must be resentenced in light of the views expressed herein. Our determination of defendant's sentencing issue obviates the need to address defendant's other issue on appeal.

For the foregoing reasons, the judgment of the circuit court of Ogle County is affirmed in part and vacated in part, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part and vacated in part; cause remanded.

BOWMAN and McLAREN, JJ., concur.