No. 82,641

STATE OF KANSAS, *Appellee,* v. CRYSTAL D. GOULD, *Appellant.*

(23 P.3d 801)

Opinion filed May 25, 2001.

*Keith E. Schroeder,* deputy district attorney, argued the cause, and *Timothy J. Chambers,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for the appellee.

*Debra J. Wilson,* assistant appellate defender, argued the cause, and *Kirk C. Redmond,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, were with her on the brief for appellant.

The opinion of the court was delivered by

SIX, J.: Defendant Crystal Gould appeals her K.S.A. 21-3609 convictions on three counts of child abuse. Gould also claims for the first time on appeal that *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), renders her enhanced sentence void and the Kansas upward departure sentencing scheme, part of the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.,* unconstitutional.

Our jurisdiction is under K.S.A. 20-3018(c), a transfer on our motion from the Court of Appeals.

Gould first contends that her convictions should be reversed. She asserts: (1) insufficient evidence; (2) prosecutorial misconduct during closing arguments; and (3) district court error in failing to instruct the jury regarding multiple counts and aggravated battery. Finding no reversible error, we affirm her convictions.

Gould next attacks her sentence on two grounds: (1) district court error in imposing an upward departure sentence based upon factors that were not substantial and compelling; and (2) the constitutional principles set forth in *Apprendi.* We agree to consider her constitutional claim and, in doing so, vacate her upward departure sentence. Our holding on the constitutional issue moots Gould's contention that the evidence supporting her upward departure sentence was not substantial and compelling.

We remand for imposition of a sentence not to exceed the statutory maximum applicable to the facts as found by the jury beyond a reasonable doubt.

## FACTS

D.G. was born to Crystal and Leland Gould on September 20, 1996. Her brother, L.G., and sister, S.G., twins, were born on January 4, 1998. The Goulds' friend and co-worker Robert E. Popp II was babysitting the children on January 23, 1998. The twins were about 3 weeks old.

On the evening of the 23rd, defendant Gould and Leland went out with Leland's parents. Before the couples met that evening, Edith, Leland's mother, called Popp at 9:30 p.m. to check on the children. Popp reported the children were fine; however, Edith heard a baby crying in the background. Gould and Leland returned home around midnight. The children were asleep.

The next morning, Leland's parents noticed that D.G., 16 months old, was bruised and had a black eye. S.G. had bruises on her head, forehead, and knees. L.G. also had bruises on his forehead. When asked how the children got hurt, Gould said she did not know. She thought maybe D.G. hit her head on her baby bed.

Popp returned to Gould's home later that day to watch television and to check on the children. He asked Gould about the bruises on D.G.'s face. Gould said she did not know how they got there. Popp also noticed a bruise on L.G.'s head. Gould and her husband said D.G. must have hit L.G. with a toy.

On Sunday, January 25, Gould and Leland took the children to a park and to the zoo. L.G. became fussy at home around 9 p.m. His parents could not soothe him. Between 10 and 10:30 p.m., Gould laid L.G. on her bed and turned on a radio. She was alone in the room with L.G., off and on, until around 11 p.m. Then, Gould came out to tell Leland that L.G. was not breathing. L.G.'s "color was kind of bad," and his arms and legs were limp. Edith came over to watch D.G. and S.G., and Gould and Leland took L.G. to the emergency room.

When they arrived at the emergency room, L.G. was experiencing activity suggestive of seizures. He did not breathe for prolonged

periods of time. The next day, he was transferred by helicopter to Wesley Medical Center in Wichita. A CAT scan showed that L.G.'s brain was swollen. He suffered an acute bleed or epidural hematoma on the left posterior part of the brain and multiple areas of bleeding into the upper part of his brain. Further examination revealed two small circular bruises above his right hip and a hemorrhage in his left eye. The medical evidence showed that L.G. had suffered a stroke.

A physician specializing in pediatric critical care testified to the following at trial:

"This type of injury would have to have been the result of a very forceful blunt injury, either where a flat surface was brought against the fixed head, say a fist hitting the skull, or shoe hitting the skull, something like that. Or where the child's head, itself, was being accelerated and ran into a fixed object of say a wall or a door."

The physician said that, based on the analysis of an MRI scan, the epidural hematoma could not have occurred before January 25, 1998. The multiple areas of subdural bleeds were consistent with forceful and repetitive shaking. According to the physician, L.G. will likely require total care for the rest of his life. L.G. "will probably suffer from spastic quadriplegia, which means his muscles will constantly be stiff and difficult for him to coordinate or move. He will probably not be able to talk."

S.G. and D.G. were examined on January 29. S.G. had three fractured ribs, a contusion on a rib, and a fractured thigh bone. A nuclear medicine physician testified that these injuries were consistent with a squeezing injury. S.G. also had a skull fracture and evidence of bleeding in her brain consistent with the type of injury an infant might sustain in an automobile accident. D.G. had a bruise on her right cheek, a smaller bruise on her left cheek, and some bruising on her forehead. She also had a broken rib consistent with a squeezing injury.

Gould denied harming her children. Two witnesses testified that Gould had abused her children. In November 1997, they saw Gould with D.G. at a laundromat. She jerked D.G. around by the arm, pulling her from washer to washer, and was "flicking" the

child in the mouth. Another bystander confronted Gould, and one of the witnesses called the police.

In January 1998, one of the neighbors was in the laundry room next to Gould's apartment and heard a woman yelling inside the apartment. The neighbor heard a loud slapping sound, followed by a baby's scream. Another neighbor saw Gould, while she was still pregnant with the twins, pick D.G. up by the arm, kick her in the head and call her a "little f---ng bitch."

Popp, the babysitter, also testified regarding Gould's abusive activities. He said Gould was physically violent with the children when they cried. She would often place the children alone in her bedroom and turn on a radio. Popp described a closet/make-shift bedroom where D.G. was placed, with the louvered doors shut, for hours at a time.

Popp had seen Gould slap the children. He saw her pick up S.G. by the ribs and shake her. He also saw Gould pick up L.G. by one arm, scream at him, slap his face, and drop him in a violent manner. This drop caused L.G. to tremble and his eyes to roll back into his head.

Gould was charged with three counts of child abuse under K.S.A. 21-3609. The jury convicted her on each count.

## Sentencing

The district court imposed a controlling sentence of 136 months, with a post-release supervision period of 36 months.

Under K.S.A. 21-3609, a defendant guilty of abuse of a child has committed a severity level 5 person felony. Gould had no criminal record and her criminal history score was I. The authorized sentencing range was 31-32-34 months. K.S.A. 2000 Supp. 21-4704. The State moved for an upward departure sentence under K.S.A. 2000 Supp. 21-4716 citing as reasons: (1) the victims were Gould's children; (2) the abuse of L.G. was so bad that he will never walk, talk, or care for himself; (3) the abuse of S.G. was severe; and (4) Gould showed no emotion or remorse until she was found guilty. The district court granted the motion and departed to 68 months each for Counts I and II (involving the twins), to run consecutively. Gould was sentenced to 34 months for Count III (involving D.G.),

to run concurrent with Counts I and II. The three K.S.A. 2000 Supp. 21-4716(b)(2) aggravating factors the judge found to be substantial and compelling reasons for imposing the departure sentences were: (1) the victims "were particularly vulnerable due to age, infirmity, or at least reduced physical capacity which was known or should have been known to the offender"; (2) "the defendant's conduct during the commission of the current offenses manifested excessive brutality to the victims in a manner not normally present in that offense"; and (3) "the offense involved a fiduciary relationship which existed between the victims and the defendant." See K.S.A. 2000 Supp. 21-4716(b)(2)(A) (B) and (D). Because K.S.A. 2000 Supp. 21-4720(c)(3) prohibits the "total imprisonment term of the consecutive sentences, including the imprisonment term for the departure crime" to "exceed twice the maximum presumptive imprisonment term of the departure sentence following aggravation" (the double-double rule), Gould's maximum total sentence was limited to 136 months.

## DISCUSSION

We first consider Gould's claims challenging her convictions.

### Sufficiency of Evidence

Gould contends that her convictions with respect to S.G. and D.G. are not supported by sufficient evidence. Our standard of review requires us to review all of the evidence in the light most favorable to the prosecution. If, after doing so, we are convinced that a rational factfinder could have found Gould guilty beyond a reasonable doubt, the evidence is sufficient. *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998).

Gould was convicted under K.S.A. 21-3609, which says: "Abuse of a child is intentionally torturing, cruelly beating, shaking which results in great bodily harm or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." Gould acknowledges that D.G. and S.G. sustained numerous fractures, but argues that there is no evidence that she inflicted the injuries.

The testimony relating to D.G. showed that in November 1997, an officer was called to a laundromat, where bystanders saw Gould

"yank the baby" by her arm from washer to washer. Gould also kept "flicking" D.G. in the mouth so hard that the other people in the area could hear it. In addition, Gould's neighbor saw her kick D.G. in the head outside of the Goulds' apartment. Another time, the neighbor saw Gould pick up D.G. by the arm and carry her into the apartment from the hallway.

Popp testified that on several occasions, he saw Gould become physically violent with the children. He witnessed Gould slap D.G. across the face and in the head. Gould would "yell at the top of her lungs" at D.G. and spank her "like you would an older child." When D.G. was riding in the car and would speak in child-like chatter, Gould would slap her in the mouth. She would shut D.G. in her closet/make-shift bedroom for hours at a time. When Popp was around, he would not let Gould touch D.G. When Gould got angry at D.G., she would throw objects toward the child.

Gould had no explanation for the bruises found on D.G.'s head on January 25, 1998. As for the child's broken rib, Popp saw Gould squeeze D.G.'s siblings around the ribs. D.G. had a broken rib consistent with a squeezing/shaking type of injury. Popp said he never saw Leland slap the children.

S.G. had a skull fracture and bleeding in and around her brain. Her injuries were consistent with a severe shaking. Popp testified that S.G. went through a "crying phase" where it was difficult to comfort her. He saw Gould squeeze S.G. He said that Gould would pick S.G. up by her ribs, shake her, and tell her to "shut up."

Gould argues that Popp's testimony was inconsistent and not credible. She points out that he was confused about the dates he allegedly witnessed abuse. She also notes that although Popp said he attempted to call the Department of Social and Rehabilitation Services (SRS) to report incidents of abuse, there was no record of any SRS reports. In addition, Popp said he told Edith about his concerns; however, Edith testified that Popp never expressed these concerns to her.

Any inconsistencies relate to Popp's credibility. We do not reweigh the evidence or pass on Popp's credibility. See *State v. Orr*, 262 Kan. 312, 322, 940 P.2d 42 (1997). We have no hesitancy in

concluding that a rational factfinder could have found Gould guilty beyond a reasonable doubt of abusing D.G. and S.G.

## Jury Instructions

Gould asserts that the district court erred in failing to instruct the jury using the Pattern Instructions for Kansas (PIK) Crim. 3d 68.07 (1998 Supp.) (Multiple Counts Verdict Instruction). She acknowledges that she neither requested PIK Crim. 3d 68.07 at trial nor objected to its omission. No party may assign as error the failure to give an instruction unless the party objects before the jury retires, stating distinctly the matter objected to and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414. Therefore, we inquire whether the failure to give the instruction is clearly erroneous. Instructions are clearly erroneous only if we are firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

PIK Crim. 3d 68.07 (1998 Supp.) says:

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

The failure to give the multiple-count instruction can be reversible error if the jury is misled into believing that a finding of guilty on one count mandates a finding of guilty on the others. *State v. Cameron & Bentley*, 216 Kan. 644, 651, 533 P.2d 1255 (1975). Gould has not directed us to any case where a conviction has been reversed for failure to give PIK Crim. 3d 68.07. See *State v. Kelly*, 262 Kan. 755, 764, 942 P.2d 579 (1997) ("Although the multiple-count instruction should have been given in this case, we cannot find that the failure to give the instruction was clearly erroneous."); *State v. Mitchell*, 262 Kan. 687, 697, 942 P.2d 1 (1997) (although PIK Crim. 3d 68.07 should have been given, there was no prejudicial error).

Gould points out that separate verdict forms were not provided for each count. However, she fails to acknowledge that the verdict form clearly indicated three separate counts of abuse. For each count, the jury was provided with the option of finding Gould guilty of abuse, guilty of battery, or not guilty. In addition, the jury was given a separate instruction for each count, stating the elements needed to establish each charge.

Although the use of PIK Crim. 3d 68.07 would have been proper in this situation, we do not believe there is a real possibility here that the jury would have reached a different decision had the instruction been given. The failure to give the multiple-count instruction is not clearly erroneous.

We next take up Gould's second claim of error in instructing the jury. Although she denied ever hurting the children, Gould asserts that the district court's failure to instruct on aggravated battery, K.S.A. 21-3414, as a lesser included offense of child abuse is reversible error. The district court did instruct on simple battery.

Gould acknowledges that she did not request an aggravated battery instruction at trial. She contends that the district court has a duty to instruct the jury on all lesser included offenses of which there is evidence, citing *State v. McBroom,* 252 Kan. 376, Syl. ¶ 1, 845 P.2d 654 (1993). Until July 1, 1998, the district court's duty to instruct applied even though no lesser included instruction was requested. K.S.A. 21-3107(3) (1995). Thus, we were required to review lesser included offense claims that were never before the district court. In 1998, the legislature changed the rules for review of jury instructions. The current version of the relevant part of the statute, K.S.A. 2000 Supp. 22-3414(3) says:

"No party may assign as error the giving or failure to give an instruction, *including a lesser included crime instruction,* unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous." (Emphasis added.)

For a discussion of the 1998 amendment, see *State v. Saiz,* 269 Kan. 657, 661, 7 P.3d 1214 (2000); *State v. Brooker,* 27 Kan. App. 2d 396, 4 P.3d 1180, *rev. denied* 269 Kan. 935 (2000). Gould's trial began August 31, 1998, 2 months after this statutory change. The

amendment is procedural and may be retroactively applied. *Brooker*, 27 Kan. App. 2d at 400. We conclude Gould had adequate notice of the lesser included offense statutory change, and in evaluating her contention, we search for clear error.

We need not decide whether aggravated battery is a lesser included offense of child abuse. Even if it is, from a review of the record here, we conclude that there is no real possibility that the jury would have reached a different decision had the instruction been given. See *Jackson v. City of Kansas City*, 263 Kan. 143, 148, 947 P.2d 31 (1997).

The State presented evidence that Gould intentionally shook, squeezed, hit, and cruelly "punished" her children. She was the one person seen acting physically violent with the children. The physical evidence showed that the children's bruises and broken ribs and S.G.'s fractured skull were consistent with shaking and squeezing, and in the case of the twins, blunt force. Further, an instruction is not necessary where a defendant's testimony precludes a conviction for a lesser offense. *State v. Hill*, 242 Kan. 68, 74, 744 P.2d 1228 (1987). Gould testified she did not hurt the children. Failure to instruct on aggravated battery was not clearly erroneous.

### The Prosecutorial Misconduct Claim

Next, Gould contends that the prosecutor committed misconduct during closing argument. She acknowledges that she made no objection to the prosecutor's comments at trial. Generally, we do not apply the plain error rule, and reversible error normally cannot be predicated upon a complaint of prosecutorial misconduct during closing argument where no contemporaneous objection is lodged. *State v. Finley*, 268 Kan. 557, 571, 998 P.2d 95 (2000). However, if the prosecutor's statements rise to the level of violating either a defendant's right to a fair trial or the Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *Finley*, 268 Kan. at 571.

During closing arguments, the prosecutor said:

"I now offer you my thanks for your service. . . . On behalf of myself, on behalf of [L.G., S.G., and D.G.], on behalf of the people of the State of Kansas, we appreciate your service on the jury."

Gould argues that these statements gave the jury the impression that it had an obligation to Kansans to convict her. We disagree.

As Gould observes, we have held that it is improper to refer to the effect of a verdict on the community or to appeal to the interest of the jurors as members of the community. *State v. Hays*, 256 Kan. 48, 66-67, 883 P.2d 1093 (1994). The prosecutor commenced his closing remarks by apologizing to the jury for having to sit through such an unpleasant case. He said, "This was not pleasant, and it wouldn't be pleasant for anybody. We needed 12 fair and unbiased jurors. You were the ones that were chosen. I now offer you my thanks for your service." He then thanked them on behalf of himself, the victims, and the people of Kansas.

The remarks here, however, were outside of the scope of the evidence presented. The State concedes this fact. Thus, the remarks were improper. However, the remarks did not convey an obligation to the community or to the citizens to convict Gould.

The remainder of the prosecutor's closing argument focused on the facts of the case and the State's burden of proof. The error had little, if any, likelihood of changing the result of the trial. The remarks were not so gross and flagrant as to prejudice Gould and deny her a fair trial. See *Finley*, 268 Kan. at 571-72; *State v. Miller*, 268 Kan. 517, 520, 524, 997 P.2d 90 (2000).

Gould's convictions are affirmed.

## The *Apprendi* Issue

We next turn to consideration of Gould's attack on her sentence. She argues first that the statute which authorizes imposition of her upward departure sentence is unconstitutional and her sentence void. The State objects because Gould's constitutional claim was not presented to the district court. Generally, "[w]hen constitutional grounds are asserted for the first time on appeal, they are not properly before [this court] for review." *State v. Shears*, 260 Kan. 823, 837, 925 P.2d 1136 (1996). However, in *Pierce v. Board of County Commissioners*, 200 Kan. 74, Syl. ¶ 3, 434 P.2d 858 (1967), we recognized exceptions to the general rule. We recently relied on the *Pierce* exceptions in order to address an *Apprendi* argument raised for the first time on appeal in *State v. Conley*, 270

Kan. 18, 11 P. 3d 1147 (2000), *cert. denied* 532 U.S. 933 (2001). We follow our reasoning for addressing the constitutional question in *Conley* and consider the issue here.

Gould asserts that the statute which allows a court to impose an upward departure sentence is unconstitutional on its face, rendering her upward departure sentence void. When we are presented with a claim that a statute is unconstitutional, our initial inquiry is to search for a way to uphold the statute. *State v. Rucker,* 267 Kan. 816, 830, 987 P.2d 1080 (1999). We conclude that we are unable to construe the relevant portions of K.S.A. 2000 Supp. 21-4716 in a manner that would avoid the constitutional issues raised in *Apprendi.*

We first examine the holding in *Apprendi.* Apprendi pled guilty to two counts of second-degree possession of a firearm for an unlawful purpose and one count of a third-degree offense of unlawful possession of an antipersonnel bomb. The penalty for a second-degree offense carried a range of 5 to 10 years. The State reserved the right to request imposition of an enhanced sentence on one of the firearm counts. The request was based on a New Jersey hate crime statute and the State's belief that Apprendi committed the crime with a biased purpose.

The hate crime statute provided for a sentence enhancement if the court found, by a preponderance of the evidence, that the defendant acted to intimidate on the basis of race, color, gender, handicap, religion, sexual orientation, or ethnicity. The court found, by a preponderance of the evidence, that Apprendi's purpose for unlawfully possessing the weapon was to intimidate his victim on the basis of race and sentenced Apprendi to 12 years. A divided New Jersey Supreme Court affirmed. 530 U.S. at 469-72.

The United States Supreme Court, speaking through Justice Stevens, observed as a threshold matter that "constitutional protections of surpassing importance" were at stake, including the Fourteenth Amendment's due process guarantees as well as the Sixth Amendment right to a speedy and public trial by an impartial jury. 530 U.S. at 476-77. Taken together, the Court concluded that these rights formed the following guarantee: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

The Court concluded that the New Jersey hate crime statute violated this principle because it allowed imposition of a sentence beyond the statutory maximum based upon a court's finding of a certain fact by a preponderance of the evidence. The Court held the statute invalid and vacated Apprendi's sentence. 530 U.S. at 490, 496-97.

Since the Supreme Court's June 26, 2000, ruling in *Apprendi*, "hundreds of appeals have been filed and scores of decisions handed down interpreting the ruling." David E. Rovella, *A Looming 'Apprendi' tsunami?*, The National Law Journal, Jan. 8, 2001, at A1. There is little dispute that *Apprendi* has had an immediate and dramatic impact on criminal law. Indeed, Justice O'Connor presaged the *Apprendi* phenomenon by warning in her dissent that the decision represented "a watershed change in constitutional law" whose effect on state and federal determinate sentencing schemes would likely be "severe." 530 U.S. at 524, 544 (O'Connor, J. dissenting).

Federal courts have applied *Apprendi* to sentences involving drug convictions under 21 U.S.C. 841(b) (1994), an enhancement statute. These courts have found that a quantity of drugs that increases the maximum sentence to which a defendant would otherwise be exposed for a conviction under 21 U.S.C. 841(a) is a fact that must be found by a jury beyond a reasonable doubt. See, *e.g. U.S. v. Rogers*, 228 F.3d 1318 (11th Cir. 2000); *U.S. v. Doggett*, 230 F.3d 160 (5th Cir. 2000), *cert. denied Doggett v. U.S.*, 531 U.S. 1177 (2001). Both courts agreed that *Apprendi* undermined circuit precedent allowing a judge to determine drug quantity at sentencing by a preponderance of the evidence. *Rogers*, 228 F.3d at 1327; *Doggett*, 230 F.3d at 164.

*Apprendi* is likewise affecting sentencing decisions on the state level. The State citations are for informational rather than precedential purposes. In *State v. Guice*, 141 N.C. App. 177, 541 S.E.2d 474 (2000), (stay allowed January 18, 2001), the North Carolina Court of Appeals vacated an enhanced sentence imposed under the state's firearm enhancement statute after applying *Apprendi* to

hold the statute facially unconstitutional. The firearm enhancement statute said that "[t]he court shall increase the minimum term of imprisonment to which the [defendant] is sentenced by 60 months" if the court "finds that the [defendant] used, displayed, or threatened to use or display a firearm at the time of the felony." 541 S.E.2d at 487. The requisite factual determination was explicitly removed from the jury. The statute exposed Guice to a greater punishment than that authorized by the jury's verdict. The *Guice* court concluded that *Apprendi* "commands that we find the firearm enhancement statute unconstitutional." 541 S.E.2d at 487.

The Connecticut Superior Court considered an *Apprendi* issue in *State v. Santiago*, 2000 WL 1196686 (July 25, 2000). Santiago, after a jury trial, was found guilty of first-degree manslaughter with a firearm and first-degree assault. He was sentenced to consecutive terms of 40 years for the manslaughter charge and 20 years for the assault charge. The court enhanced the sentence under a statute which authorized imposition of an additional 5-year term to run consecutive to the underlying sentence where defendant used a firearm to commit the crimes. The *Santiago* court held that the effect of the enhancement was identical to the New Jersey provision held unconstitutional in *Apprendi* and modified the sentence accordingly. See also *People v. Chanthaloth*, 318 Ill. App. 3d 806, 815-16, 743 N.E.2d 1043 (2001) (convictions of residential burglary and home invasion with extended term sentence 10 years longer than the maximum was not permissible; trial court's determination based on aggravating factors violated "broad constitutional" rule of *Apprendi*.)

In *State v. Grossman*, 622 N.W.2d 394 (Minn. App. 2001), *aff'd* 636 N.W.2d 545 (2001), Grossman was convicted of attempted second-degree murder, first-degree assault, third-degree assault and three counts of first-degree criminal sexual conduct. A pretrial evaluation concluded that Grossman was "a dangerous sexual predator." The *Grossman* court considered a Minnesota statute which required imposition of an enhanced sentence upon certain court findings regarding whether the defendant is a patterned sex offender. Grossman relied on *Apprendi* in contending that his enhanced sentence violated due process because the court, not the

jury, made the requisite findings. The Minnesota court agreed and invalidated the statute. 622 N.W.2d at 399.

The Supreme Court of North Dakota in *Clark v. State*, 621 N.W.2d 576 (N.D. 2001), *cert. denied* 532 U.S. 1043 (2001), faced a slightly different situation. Clark was charged with murder. The jury was instructed on the lesser crime of reckless manslaughter and directed to consider Clark's use of a firearm. Clark was convicted of reckless manslaughter. The district court imposed an additional term of incarceration based on a statute which allowed the enhancement upon the court's finding that a firearm was used in the commission of the crime. The district court reasoned that Clark's *Apprendi* concerns were satisfied because the jury was instructed to consider Clark's use of a firearm, albeit in the context of whether he recklessly caused the death of another.

The *Clark* court found that *Apprendi* error, if any occurred, was harmless, based in part on its reasoning that Clark's use of a firearm was never in issue. 621 N.W.2d at 581-82. Our reading of *Clark* suggests that the district court's instruction to the jury on Clark's use of a firearm also influenced the outcome. Our conclusion finds further support in the opinion's signal to the North Dakota legislature: "Substantial portions of [the enhancement statute] may not withstand constitutional challenge under the rule announced in *Apprendi*. We urge the legislature to address this important issue and make necessary amendments to bring the statute within *Apprendi*'s constitutional requirements." 621 N.W.2d at 580 n.1.

## K.S.A. 2000 Supp. 21-4716

With this survey of the law in mind, we turn to the Kansas statute at issue. K.S.A. 2000 Supp. 21-4716, which provides a mechanism for imposing departure sentences, is part and parcel of the KSGA. The KSGA was enacted to reduce prison overcrowding by making a distinction between more serious and less serious offenders. The guidelines were also enacted to promote uniformity and standardize sentences so that similarly situated offenders would be treated in the same way. *State v. Richardson,* 20 Kan. App. 2d 932, Syl. ¶ 4, 901 P.2d 1 (1995).

Two grids, which contain the sentencing range for drug crimes and nondrug crimes, were developed for use as tools in sentencing. The KSGA grids provide an overview of presumptive felony sentences. The determination of a felony sentence is based on two factors: the current crime of conviction and the offender's prior criminal history. The sentence contained in the grid box at the juncture of the severity level of the crime of conviction and the offender's criminal history category is the presumed sentence. K.S.A. 2000 Supp. 21-4704.

Departure sentences by definition challenge the notion of uniformity. Therefore, it is only in exceptional circumstances that the district court may exercise its discretion and impose a sentence not based exclusively on offense severity and criminal history.

K.S.A. 2000 Supp. 21-4716(a) provides:

"The sentencing judge shall impose the presumptive sentence provided by the sentencing guidelines for crimes committed on or after July 1, 1993, unless the judge finds substantial and compelling reasons to impose a departure. If the sentencing judge departs from the presumptive sentence, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure."

K.S.A. 2000 Supp. 21-4716(b) provides in pertinent part:

"(2) Subject to the provisions of subsection (b)(3), the following nonexclusive list of aggravating factors may be considered in determining whether substantial and compelling reasons for the departure exist:

(A) The victim was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity which was known or should have been known to the offender.

(B) The defendant's conduct during the commission of the current offense manifested excessive brutality to the victim in a manner not normally present in that offense.

(C) The offense was motivated entirely or in part by the race, color, religion, ethnicity, national origin or sexual orientation of the victim.

(D) The offense involved a fiduciary relationship which existed between the defendant and the victim.

(E) The defendant, 18 or more years of age, employed, hired, used, persuaded, induced, enticed or coerced any individual under 16 years of age to commit or assist in avoiding detection or apprehension for commission of any person felony or any attempt, conspiracy or solicitation as defined in K.S.A. 21-3301, 21-3302 or 21-3303 and amendments thereto to commit any person felony regardless of whether the defendant knew the age of the individual under 16 years of age.

(F) The defendant's current crime of conviction is a crime of extreme sexual violence and the defendant is a predatory sex offender. . . .

. . . .

(G)   The defendant was incarcerated during the commission of the offense."

Greatly simplified, K.S.A. 2000 Supp. 21-4716 allows imposition of a term beyond the maximum specified in the appropriate sentencing grid box based upon a court finding the existence of one or more aggravating factors. The statute is silent on a burden of proof to be utilized by the district judge to establish a substantial and compelling reason to depart. Facts "established for use in sentencing require less evidentiary weight than facts asserted for conviction." *State v. Spain*, 263 Kan. 708, 713, 953 P.2d 1004 (1998). In *Spain*, we held that the implicit standard of proof for aggravating circumstances under K.S.A. 21-4635(c) in a hard 40 case is preponderance of the evidence. 263 Kan. at 714. As we point out in the following analysis, *Apprendi* supplies the standard for an upward departure.

## Analysis

The State contends at the outset that *Apprendi* does not apply to this case because Gould's sentence is not greater than the statutory maximum. The State argues that under the KSGA, a presumed sentence is established based upon the defendant's criminal history and the severity level of the crimes of conviction. The State reasons that the presumed sentence is not the maximum sentence allowed by law. The State here asserts that the maximum sentence Gould could have received for the multiple convictions of abuse of a child, based on her criminal history classification and the limitations of the "double-double rule," was 136 months' imprisonment. Thus, the sentence imposed by the district court did not exceed the statutory maximum as contemplated by *Apprendi*. The State's argument is not persuasive.

Under *Apprendi*, it does not matter how the required finding is labeled, but whether it exposes the defendant to a greater punishment than that authorized by the jury's verdict. See 530 U.S. at 469, 490-96. Gould's jury verdict "authorized" a sentence of 31 to 34 months for each child abuse conviction. By imposing two 68-

month sentences, the district court went beyond the maximum sentence in the applicable grid box and exposed Gould to punishment greater than that authorized by the jury's verdict. In so concluding, we agree with *U.S. v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000) ("*Apprendi* makes clear that the 'prescribed statutory maximum' refers simply to the punishment to which the defendant is exposed solely under the facts found by the jury."). Gould's sentence of 68 months for two counts of child abuse exceeded the statutory maximum, and *Apprendi* applies.

Gould argues that the holding in *Apprendi* reveals a fundamental flaw in K.S.A. 2000 Supp. 21-4716: It allows a fact or facts, other than that of a prior conviction, not found by a jury beyond a reasonable doubt, to be used to justify imposing a sentence beyond the statutory maximum for the underlying crime. Gould's arguments parallel the reasoning set forth in *Apprendi.*

Gould correctly asserts that the Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). In *Apprendi*, the State argued that the fact findings required by the hate crime statute were not elements of the underlying crime of firearm possession but were separate sentencing factors which did not require proof beyond a reasonable doubt under *Winship*. The Court rejected this notion, noting the "constitutionally novel and elusive distinction between 'elements' and 'sentencing factors,' but reasoning that "the relevant inquiry is one not of form, but of effectdoes the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" 530 U.S. at 494.

Justices Thomas and Scalia emphasized the importance of this principle in separate concurrences. Justice Scalia in his concurring opinion said:

"[T]he guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury' has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury." 530 U.S. at 499.

Justice Thomas with whom Justice Scalia joins, elaborated:

"[I]f the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, including the fact of a prior conviction—the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime." 530 U.S. at 501.

Our inquiry continues with Gould's insistence that the Sixth and Fourteenth Amendments to the United States Constitution require trying to a jury any facts which, if found, expose her to a penalty beyond the statutory maximum. The *Apprendi* court agreed, emphasizing that the right to a jury determination is " 'the great bulwark of [our] civil and political liberties,' " and has been interpreted to require " 'the truth of every accusation . . . be confirmed by the unanimous suffrage of twelve of [the defendant's] equals'. . . ." 530 U.S. at 477.

Gould also cites *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999), which held that not only must a fact that increases the maximum sentence be found by a jury beyond a reasonable doubt, it must also be charged in the indictment. *Apprendi* noted that while *Jones* "foreshadowed" its holding, *Apprendi* did not assert his constitutional claim based on the omission of the sentence enhancement factor in the indictment, and the Court declined to consider the issue. 530 U.S. at 477 n.3. Gould mentions the indictment requirement in her discussion of *Jones*. Because it is not necessary to our holding today, we will save analysis of the question for another case in which it is squarely presented.

The district court made findings as to certain aggravating factors which increased Gould's sentence beyond the statutory maximum. The district court, rather than the jury, made these findings as required by K.S.A. 21-4716(a). *Apprendi* requires that such findings be made by the jury beyond a reasonable doubt. Because Kansas law authorizing upward departure sentences directly contravenes this requirement, the law is unconstitutional.

The State urges that Gould's sentences may withstand the constitutional infirmities of the Kansas scheme for upward departures.

The State points out that one of the aggravating factors supporting upward departure was the existence of a fiduciary relationship between Gould and the victims, her children, and one was the extreme vulnerabililty of two of the victims. Indeed, we have recognized the existence of a fiduciary relationship between parent and child. *State v. Ippert*, 268 Kan. 254, 995 P.2d 858 (2000). Here, the State reasons, there was no dispute that Gould was the mother of her victims nor was there dispute that two of her victims were 21 days old. Thus, the State concludes that neither of these matters need be presented to a jury or found beyond a reasonable doubt because they were not at all in question.

The State, in essence, urges this court to apply principles of harmless error. This we cannot do. The Kansas scheme for imposing upward departure sentences, embodied in K.S.A. 2000 Supp. 21-4716, is unconstitutional on its face. Gould received a sentence beyond the statutory maximum based upon a court finding of certain aggravating factors found by a preponderance of the evidence. *Apprendi*, on the other hand, requires "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Any other procedure "is an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." 530 U.S. at 497. Gould's sentence was imposed pursuant to an unconstitutional sentencing scheme and cannot stand.

With this conclusion in mind, we need not address Gould's arguments based on the Kansas Constitution.

We question, but need not decide, if the tender age of the children here qualifies as an aggravating factor for an upward departure, since age is an element of child abuse under K.S.A. 21-3609. See K.S.A. 2000 Supp. 21-4716(b)(3). In *State v. Salcido-Corral*, 262 Kan. 392, 940 P.2d 11 (1997), the sentencing court used the vulnerability of the victim due to her age as an aggravating factor to justify a sentencing departure for the defendant's conviction for three sex crimes, one of which was aggravated indecent liberties. 262 Kan. at 409-10, 414. We concluded that the vulnerability of the victim based on her age was an improper aggravating factor to

justify the sentencing departures because the victim's age was already a statutory element of the crime. 262 Kan. at 415.

*Apprendi* dictates our conclusion that Kansas' scheme for imposing upward departure sentences, embodied in K.S.A. 2000 Supp. 21-4716, violates the due process and jury trial rights contained in the Sixth and Fourteenth Amendments to the United States Constitution. Gould's sentence must be vacated and remanded for resentencing.

Our holding on the constitutionality of upward departures under the KSGA has no retroactive application to cases final as of June 26, 2000, the date *Apprendi* was decided. However, the new constitutional sentencing rule established by *Apprendi* must be applied here and in all cases pending on direct appeal or which are not yet final or which arose after June 26, 2000. See *State v. Hood,* 242 Kan. 115, 117, 744 P.2d 816 (1987). Our holding here has no effect on downward departures under K.S.A. 2000 Supp. 21-4716.

Affirmed in part, reversed in part, and remanded.

ABBOTT, J., dissenting: I find the *Apprendi* decision disturbing. It appears it is going to have a considerable impact on the judicial system in many areas and particularly on sentencing guidelines. I recognize that the legislature can play games with sentencing guidelines and amend them so that *Apprendi* would not apply to most sentences.

I am troubled by other matters, although I recognize that they probably do not fall under *Apprendi*. For instance, cases frequently come before us where, if the defendant is tried as a juvenile, the most he or she will have to serve is a few years. If, on the other hand, the defendant is tried as an adult for the same offenses, he or she may face up to 100 years. We have other areas of the law in which similar results are reached, and although they do not fall under *Apprendi*, they seem fundamentally unfair in light of *Apprendi*.

I would affirm this decision under the harmless error rule. I would even consider affirming it on the basis that the sentencing guidelines maximum sentence was not exceeded in this case. An "upward departure" simply allows the trial court to use a statutory

maximum that the defendant can receive. Recently, in *State v. Conley*, 270 Kan. 18, 34-35, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 933 (2001), we held anything given in the "upward departure," where the sentence is life, does not violate *Apprendi*. Here, the defendant did not receive more than the guidelines authorized. She merely received more than the standard sentence because certain sentencing factors were present.

Here, a fiduciary relationship existed. K.S.A. 2000 Supp. 21-4716(b)(2)(D); *State v. Ippert*, 268 Kan. 254, 995 P.2d 858 (2000). Gould recognizes that facts that do not increase a defendant's punishment beyond that authorized by the underlying statute need not be proven to a jury beyond a reasonable doubt, citing *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). See also *Conley*, 270 Kan. at 35-36 (finding that the K.S.A. 21-4638 hard 40 sentencing scheme is constitutional).

One of the factors relied upon by the sentencing court in granting the upward departure was the fact that the defendant had a fiduciary relationship with the victims. The jury was presented with overwhelming evidence that Gould, the mother of the victims, had a fiduciary relationship with S.G., D.G., and L.G. We have defined "fiduciary relationship" as follows:

"The term 'fiduciary relationship' refers to any relationship of blood, business, friendship, or association in which one of the parties places special trust and confidence in the other. It exists in cases where there has been a special confidence placed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one placing the confidence. A fiduciary has the duty to act in good faith and with due regard to the interests of the party placing confidence in the fiduciary." *Hawkinson v. Bennett*, 265 Kan. 564, Syl. ¶ 4, 962 P.2d 445 (1998).

Not only was Gould the victims' mother, but she was also a primary caregiver to the victims. Thus, any error was harmless because it is clear beyond a reasonable doubt that a rational jury would have found that a fiduciary relationship existed.

I would affirm the decision in this case on the basis that even if the majority is correct, the mistake is harmless beyond a reasonable doubt.

DAVIS, J., joins in the foregoing dissenting opinion.